Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 12, 2004        Decided June 4, 2004

No. 03-3058

UNITED STATES OF AMERICA,
APPELLEE

v.

MAURICE W. HAYES, A/K/A MO,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(01cr00180–11)

———

*Elisha A. King*, appointed by the court, argued *pro hac vice* for appellant. With her on the briefs was *Charles B. Wayne*.

*Nicole A. Saharsky*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Roy*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*W. McLeese III*, and *Gregory G. Marshall*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*; RANDOLPH and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Maurice "Mo" Hayes challenges four evidentiary rulings made during his trial for submitting false overtime claims to the Department of Education.

The government sought to prove that Hayes, a Bell Atlantic technician assigned to the Department, conspired with fellow technicians Robert Sweeney and William Cousin to submit false time sheets claiming overtime pay. Elizabeth Mellen, the Department employee who supervised the Bell Atlantic contract, permitted this practice in order to secure the technicians' cooperation with her larger conspiracy to steal hundreds of thousands of dollars in electronic equipment. *See United States v. Mellen*, 89 Fed. App. 268, 2004 WL 438571 (D.C. Cir. Mar. 5, 2004). Some of the bogus hours represented time the technicians spent performing personal favors for Mellen. Others were pure padding.

Sweeney and Cousin cooperated with the government and testified against Hayes. The government also introduced mobile phone records and building security logs that, it argued, were inconsistent with the time sheets Hayes had completed. The jury convicted Hayes and the district court sentenced him to 27 months' imprisonment.

One issue arises from the cross-examination of Sweeney. Sweeney claimed he never received payment for favors he performed for Mellen and her family, and that his only reward was Mellen's acquiescence in the overtime scheme. Defense counsel showed Sweeney a copy of a $100 check from Mellen's relatives payable to Sweeney and dated the day the technicians performed one of these favors. Although Sweeney acknowledged that his date of birth and driver's license number appeared on the front of the check, and that this was the sort of information a bank would put on a check when cashing it, he said he did not recall receiving the check. The

copy of the check, marked for identification but not introduced into evidence, showed only the front.

The trial resumed four days later. After testimony ended for the day, Hayes' attorney told the court that he had obtained the original check, that the back bore what purported to be Sweeney's signature, and that he was "going to have to call [Sweeney] to show him the endorsement on the back" of the check. A brief discussion took place between the court and counsel for the defense and prosecution, ending with the court's statement that it would "deal with this tomorrow." Late on the next day, after three defense witnesses testified and the government presented a rebuttal witness, defense counsel announced that he had no further witnesses and the jury left. At that point, defense counsel told the court that he had forgotten about introducing the check and recalling Sweeney to the stand. Treating these statements as motions, the court denied both.

Hayes argues that the court's refusal to allow him to recall Sweeney violated his Sixth Amendment right to confront the witnesses against him. The Confrontation Clause ensures effective cross-examination, but it does not deprive trial courts of all authority to restrict a defense attorney's questioning of government witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Some questions on cross-examination go beyond the scope of direct, deal with matters at the fringe of the case, are repetitive, confuse the issues, harass the witness, or invite the jury to consider extraneous matters. Courts may impose reasonable limits on such cross-examination, even when the questioning is intended to undermine the witness's credibility. The Confrontation Clause is violated only when the court bars a legitimate line of inquiry that "might" have given the jury a "significantly different impression of [the witness's] credibility." *Id.* at 680; *United States v. Davis*, 127 F.3d 68, 70–71 (D.C. Cir. 1997). In this case, the district court thought that more cross-examination of Sweeney about the check would have little probative value and would confuse the jury in light of the fact that Sweeney's fraud—which he admitted—did not turn on whether he received money for doing favors for Mellen's relatives. *See*

FED. R. EVID. 403. Hayes' attorney had already cross-examined Sweeney extensively about the check, eliciting responses that confirmed the accuracy of the personal information on the front and Sweeney's admission that this information indicated the check had been cashed. Recalling Sweeney to the stand to ask about the endorsement on the back could hardly have affected the jury's impression of his credibility. The district court therefore did not abuse its discretion in refusing to allow it.

The court also refused to admit the check into evidence at the close of the case. Whether Sweeney received the check was a collateral matter—relevant to his credibility but not to the underlying case. While the court allowed Hayes to cross-examine Sweeney about the subject, the court properly precluded the introduction of extrinsic evidence (the check) to contradict Sweeney's answers. *See United States v. Tarantino*, 846 F.2d 1384, 1409 (D.C. Cir. 1988).

The next issue also arose during Sweeney's testimony. On the morning of December 9, 1999, investigators conducted a series of raids directed at the larger conspiracy, including visits to the homes of Sweeney and Hayes. The investigators persuaded Sweeney to phone his co-conspirators and allow the government to record the conversations. Sweeney's first call was to Mellen. It ended with the following exchange:

> Mellen: Are you going to be able to handle this? Is Mo in this?
>
> Sweeney: I don't know.
>
> Mellen: Well you get Mo whatever you do.
>
> Sweeney: Alright.

About an hour later, Hayes called Sweeney to tell him that investigators had visited his home. The conversation included the following exchanges:

> Sweeney: Um, so, uh, what are you, what do you think we're going to do?
>
> Hayes: Tell the truth.

> Sweeney: Um-hum. Well, that's what, that's what I did.
>
> Hayes: That's all you've gotta do.
>
> Sweeney: Yeah, I was wondering about that, uh, t.v. Liz [Mellen] got.
>
> Hayes: Tell the truth.
>
> Sweeney: Yeah, well, it's kind of, kind of fuzzy there, because like Martin got it and then it, you know it was . . .
>
> Hayes: That's all you know.
>
> Sweeney: No.
>
> Hayes: Tell them what you know. Let it go. Tell them what you know and let it go. Out of your hands now. Tell the truth.
>
> * * *
>
> Sweeney: Well, um, I guess we'll just have to see how it goes.
>
> Hayes: Well, tell the truth. The truth works. All right.

The government moved for the admission of the first tape during Sweeney's testimony. The defense objected on the basis of relevancy. The government replied: "In the tape, Elizabeth Mellen tells Bob Sweeney to make sure that he gets ahold of Mo and gets Mo in on covering this up." The court acknowledged that the tape "may not add anything" but admitted it.

Concerned that the first tape suggested Hayes' participation in a cover-up, the defense sought to cross-examine Sweeney about the second tape, in which Hayes told Sweeney to "tell the truth." The government objected, arguing that "it is the defendant's own self-serving hearsay" and beyond the scope of the direct examination. The court sustained the objection, agreeing with the government's second ground because Sweeney never testified that he "got Mo" as Mellen had suggested. Later in the trial, Hayes sought to introduce

the second tape as substantive evidence, arguing that his injunction to "tell the truth" demonstrated that he did not have a guilty state of mind. The court denied this request as well on the ground that the conversations were hearsay.

Hayes does not argue that the court erred in admitting the first tape. His argument—with which we agree—is that the court abused its discretion in refusing to allow him to cross-examine Sweeney about the second tape and to introduce it as substantive evidence. The government makes no effort to defend the court's "beyond the scope" ruling. The sole purpose of admitting the first tape was to show that Mellen asked Sweeney to get Hayes involved in a cover-up. It must have left the jury with the impression that Sweeney followed up and got Hayes to agree. Hayes was "not required to let this potentially damaging inference hang in the air." *Macaulay v. Anas*, 321 F.3d 45, 53–54 (1st Cir. 2003). "It is always open in a criminal case for the defendant to explain away the force of specific items of the government's proof by showing the existence of other hypotheses." *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993).

The government does argue that the second tape was hearsay, and that the district court therefore properly refused to admit it into evidence. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Hayes argues he did not offer his statements on the tape for their truth. Rather, he claims the fact he told Sweeney to "tell the truth" indicates he did not think he did anything wrong, making it less likely that he had the specific intent required to sustain the conspiracy and theft charges. *See Morissette v. United States*, 342 U.S. 246 (1952) (theft); *United States v. Wynn*, 61 F.3d 921, 929 (D.C. Cir. 1995) (conspiracy). Most of Hayes' statements on the tape are not assertive and therefore do not express a "truth" for which they could be offered. *See United States v. Long*, 905 F.2d 1572, 1579–80 (D.C. Cir. 1990). The imperative "tell the truth" does not expressly assert anything.

The government argues that "tell the truth" was an implied assertion. Investigators had visited Hayes earlier that morning and so, according to the government, he must have suspected that Sweeney was cooperating. By saying "tell the truth," therefore, he was actually asserting "I am innocent." But that is beside the point. Statements inadmissible for one purpose may be admissible for another. Even if Hayes did intend implicitly to assert his innocence, his statements were still admissible to show his state of mind. *See United States v. Brown*, 490 F.2d 758, 762–63 (D.C. Cir. 1973). The district court abused its discretion in excluding the tape.

When explaining its decision to exclude the tape, the district court noted that the government would not have the opportunity to cross-examine Hayes about it because Hayes would not take the stand. Hayes claims this statement violated his Fifth Amendment right against self-incrimination by making him choose between taking the stand and forfeiting the chance to present otherwise admissible evidence. (Hayes does not argue that the district court's rulings on the tape violated his Sixth Amendment right to confront the witnesses against him.) We think Hayes misinterprets the district court's statement. The court never told Hayes he would have to testify to have the tape admitted. Far from saying, or even implying, that it would admit the tape if Hayes testified, the court merely explained the rationale for the hearsay rule. *See Anderson v. United States*, 417 U.S. 211, 220 (1974).

The district court's errors in excluding the Hayes–Sweeney tape and in refusing to permit cross-examination of Sweeney about it, although not constitutional, would nevertheless lead us to reverse Hayes' conviction unless the errors had no "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Given the strength of the government's case, we believe the court's mistakes were harmless. Sweeney and Cousin both testified about Hayes' participation in the conspiracy. Documentary evidence corroborated their testimony. The sheer number of hours Hayes claimed, often in excess of 90 hours a week, were implausible in light of the

progressive decline in the technicians' workload, as recounted by a defense witness. The government introduced building security logs showing Hayes arriving and departing at times inconsistent with his overtime claims, although other testimony indicated that these records were not necessarily reliable. The government also introduced mobile phone records showing Hayes making calls from Maryland on 183 occasions when he claimed to be working in Washington, D.C. Hayes' counsel argued that someone else could have been using the phone, but the vast majority of the calls were to Hayes' home or business, and Sweeney and Cousin testified that Hayes always answered his mobile phone when they called it.

Moreover, the excluded tape would not have added much to Hayes' defense, and introducing it might have been counterproductive. Although the jury could have inferred from the conversation that Hayes lacked criminal intent, that is hardly the only inference. The jury could well have thought Hayes was telling Sweeney not to make their situation worse by obstructing justice. More troubling is the fact that Hayes could not cross-examine Sweeney about the tape, leaving the jury with the impression Hayes may have participated in a cover-up. But in light of the other evidence against Hayes, we cannot say this restriction had any significant impact on the verdict.

*Affirmed.*